## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANNIA

| | |
|---|---|
| **REBECCA MUNGIA ORTEGA,** individually and on behalf of all others similarly situated, | |
| | **Case No.:** |
| Plaintiff, | |
| v. | |
| **WIRX PHARMACY,** | **JURY TRIAL DEMANDED** |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Rebecca Mungia Ortega ("Plaintiff"), individually and on behalf of all others similarly situated, through the undersigned counsel, hereby alleges the following against Defendant WIRX Pharmacy ("WIRX" or "Defendant").

## NATURE OF THE ACTION

1. Plaintiff brings this class action against Defendant for its failure to exercise reasonable care in securing and safeguarding individual's sensitive personal data and protected health information ("PHI")—including, but not limited to: clinical information (diagnosis/conditions, medications, and other treatment information), demographic information (Social Security number, address, date of birth, and other identifiers), and claims information (collectively known as "Private Information").

2. According to Defendant, on or around December 7, 2025, WIRX noted suspicious activity in its network environment.

3. WIRX conducted a subsequent investigation into this suspicious activity that uncovered a cybercriminal had accessed files containing the Private Information of its patients (the "Data Breach") from December 6, 2025 to December 7, 2025. Thus, the Private Information

1

of innumerable patients was compromised.

4.    Although WIRX discovered the cyberattack on or around December 7, 2025, it did not notify affected parties until February 12, 2026: more than two months after it discovered the Data Breach.

5.    Defendant's security failures enabled the hackers to steal the Private Information of Plaintiff and Members of the Class (defined below). These failures put Plaintiff's and Class Members' Private Information and interests at serious, immediate, and ongoing risk and, additionally, caused costs and expenses to Plaintiff and Class Members associated with delayed healthcare treatment, time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate and deal with the actual and future consequences of the Data Breach, including, as appropriate, reviewing records for fraudulent charges and healthcare services billed for but not received, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, initiating and monitoring credit freezes, and the stress, nuisance and annoyance of dealing with all issues resulting from the Data Breach.

6.    The Data Breach was caused and enabled by Defendant's violation of its obligations to abide by best practices and industry standards concerning the security of patients records and Private information.  Defendant failed to comply with security standards and allowed its customers' Private Information to be compromised by cutting corners on security measures that could have prevented or mitigated the Data Breach that occurred.

7.    Accordingly, Plaintiff asserts claims for negligence, breach of implied contract, unjust enrichment/quasi-contract, breach of confidence, and breach of fiduciary duty.

8.    Plaintiff also seeks injunctive relief, monetary damages, statutory damages, and all other relief as authorized in equity or by law.

## PARTIES

**A.    PLAINTIFF REBECCA MUNGIA ORTEGA**

9.      Plaintiff Rebecca Mungia Ortega is a resident and citizen of Nogales, Arizona,

10.     In April 2025, Plaintiff's Private Information was provided[1] to WIRX in furtherance of her workers' compensation claim and specifically, for receipt of perspective pharmaceutical services[2].

11.      As such, her highly sensitive information was rendered upon Defendant, including but not limited to, her name, date of birth, Social Security number, information regarding her health and information that is necessary for diagnosis and treatment, health insurance information, financial information, and billing data.

12.     In maintaining her Private Information, Defendant (at the minimum) impliedly promised to safeguard Plaintiff's Private Information. Defendant, however, did not implement proper, industry-standard safeguards to protect Plaintiff's Private Information, leading to its exposure and exfiltration by cybercriminals, who stole the Private Information at issue with the intent to sell it and/or fraudulently misuse it for personal gain.

13.      Plaintiff received a February 12, 2026 notice letter from WIRX informing her that her Private Information may have been compromised in the Data Breach.

14.     The inexplicable delay between discovery of the Data Breach and the notification to Plaintiff, denied her the opportunity to take steps to mitigate the consequences of the Data Breach and therefore caused her additional harm.

15.     Since Mid-February 2026, Plaintiff has experienced an influx of spam, including texts, phone calls, and emails.

16.     Plaintiff and Class Members have faced and will continue to face a certainly

---

[1] Plaintiff's Private Information was rendered upon WIRX by her employer's workers' compensation provider.

[2] Although Plaintiff never had prescriptions filled by WIRX, it nevertheless maintained Plaintiff's Private Information.

impending and substantial risk of future harms because of Defendant's ineffective data security measures, as further set forth herein. Some of these harms will include fraudulent charges, medical procedures ordered in patients' names without their permission, targeted advertising without patient consent, and fraudulent applications for benefits in their names, leading to Class Members being denied necessary loans or benefits in the future.

**B. DEFENDANT**

17.    Defendant WIRX Pharmacy is a Pennsylvania corporation with its headquarters located at 540 Pennsylvania Avenue, Ste. 203, Fort Washington, PA 19034. Its corporate policies, including those on data privacy, are established in and emanate from the State of Pennsylvania.

18.    According to its website, WIRX purports to be the "premier workers' compensation pharmacy…[3]"

19.    However, WIRX's reach is not relegated to Pennsylvania, as it provides pharmaceutical services to this demographic in Arizona, Delaware, Florida, Georgia, Massachusetts, Minnesota, New Jersey, New York, Texas, Utah and Wisconsin[4].

20.    In furtherance of its business, WIRX collects and retains the Private Information of thousands of individuals nationwide.

<u>**JURISDICTION AND VENUE**</u>

21.    The Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2) ("CAFA"), because (a) there are 100 or more Class Members, (b) at least one Class Member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

22.    The Court has personal jurisdiction over Defendant because its principal place of business is located, and it conducts substantial business, in this District.

---

[3] *See About Us,* https://wirxpharmacy.com/ (last accessed March 4, 2026).

[4] *Id.*

4

23.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant maintains its principal place of business in this District and therefore resides in this District pursuant to 28 U.S.C. § 1391(c)(2). A substantial part of the events, acts, and/or omissions giving rise to Plaintiff's claims also occurred in this District.

## FACTUAL ALLEGATIONS

24.     Plaintiff and Class Members are former and current WIRX patients.

25.     WIRX requires the non-public information of its patients, including Plaintiff and Class Members.

26.     Plaintiff and Class Members provided their Private Information, directly or indirectly, to Defendant with the reasonable expectation and on the mutual understanding that WIRX would comply with its obligations to keep such data confidential and secure from unauthorized access.

27.     The information held by Defendant in its computer network during the Data Breach included the unencrypted Private Information of Plaintiff and Class Members.

28.     According to its February 12, 2026 notice letter, from December 6, 2025 to December 7, 2025, Defendant experienced a cyberattack on its computer network, which affected files containing its patients', including Plaintiff's, Private Information.

29.     Additionally, WIRX appears to recognize the imminent danger faced by Plaintiff and the Class, as it recommended steps they can take to safeguard their now-pilfered sensitive data, including reviewing their "accounts…. and monitoring free credit reports for suspicious activity and to detect errors.[5]"

30.     Despite its recognition of the likely consequences of the Data Breach, WIRX did not offer Plaintiff and the Class free credit monitoring services[6].

---

[5] *See Notice of Data Event*, https://wirxpharmacy.com/wp-content/uploads/2026/02/Notice-of-Data-Event-1.pdf (last accessed Marh 3, 2026).

[6] *Id.*

31.     Instead, WIRX placed the responsibility solely on affected parties to vigilantly monitor their Private Information and accounts going forward.[7]

32.     In addition, Defendant has offered no explanation for the delay between the initial discovery of the Data Breach and the eventual notification to its patients – delay that will result in Plaintiff and Class Members suffering harm they otherwise could have avoided had WIRX made a timely disclosure of the Data Breach.

33.     In light of the types of Private Information at issue, and the fact that the Private Information was specifically targeted by cybercriminals with the intent to steal and misuse it, it can be determined that Plaintiff's and Class Members' Private Information is being sold on the dark web, meaning that unauthorized parties have accessed, viewed, and exfiltrated Plaintiff's and Class Members' unencrypted, unredacted, sensitive personal information, including names, dates of birth, Social Security numbers, medical diagnoses, and more.

34.     The Data Breach occurred because WIRX failed to take reasonable measures to protect the Private Information it collected and stored. Among other things, Defendant failed to implement data security measures designed to prevent this attack, despite repeated warnings to the healthcare industry, insurance companies, and associated entities about the risk of cyberattacks and the highly publicized occurrence of many similar attacks in the recent past on other healthcare providers.

35.     In fact, by collecting the Private Information of thousands of individuals, WIRX implicitly promised to safeguard said sensitive data.

36.     However, Defendant failed to protect Plaintiff's and the Class' Private Information, thereby allowing the impermissible disclosure that is the subject of this litigation.

37.     Plainly put, Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiff and Class Members' Private Information was

---

[7] *Id.*

safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiff and Class Members was exfiltrated through unauthorized access by an unknown, malicious cyberhacker with the intent to fraudulently misuse it. Plaintiff and Class Members have a continuing interest in ensuring that their compromised Information is and remains safe.

**A.     Defendant Failed to Maintain Reasonable and Adequate Security Measures to Safeguard its Patients' Private Information**

38.     WIRX acquires, collects, and stores a massive amount of its patients' protected Private Information, including health information and other personally identifiable data.

39.     As a condition of engaging in pharmaceutical services, WIRX requires that its patients entrust it with their highly confidential Private Information.

40.     By obtaining, collecting, using, and deriving a benefit from Plaintiff and Class Members' Private Information, WIRX assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff and Class Members' Private Information from disclosure.

41.     Defendant had obligations created by the Health Insurance Portability and Accountability Act (42 U.S.C. § 1320d *et seq.*) ("HIPAA"), industry standards, common law, and representations made to Class Members, to keep Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

42.     As evidenced by Defendant's failure to comply with its legal obligations established by HIPAA and Pennsylvania law, Defendant failed to properly safeguard Class Members' Private Information, allowing hackers to access their confidential data.

43.     Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligation to keep such information confidential and secure from unauthorized access.

44.     Prior to and during the Data Breach, Defendant promised patients, at least implicitly, that their Private Information would be kept confidential.

7

45.     Defendant's failure to provide adequate security measures to safeguard Plaintiff's and Class Members' Private Information is especially egregious because Defendant operates in a field which has recently been a frequent target of scammers attempting to fraudulently gain access to patients' highly confidential Private Information.

46.     In fact, Defendant has been on notice for *years* that the healthcare industry and health insurance companies are a prime target for scammers because of the amount of confidential customer information maintained.

47.     Defendant was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[8]

48.     The American Medical Association ("AMA") has also warned healthcare companies about the important of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[9]

49.     The number of US data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[10]  In 2017, a new

---

[8] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warnshealthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[9] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

[10]  Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From*

record high of 1,579 breaches were reported—representing a 44.7 percent increase.[11]  That trend continues.

50.    The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[12] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[13] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[14]

51.    A 2017 study conducted by HIMSS Analytics showed that email was the most likely cause of a data breach, with 78 percent of providers stating that they experienced a healthcare ransomware or malware attack in the past 12 months.

52.    Healthcare related data breaches continued to rapidly increase into 2021.[15]

53.    In the healthcare industry, the number one threat vector from a cyber security standpoint is phishing. Cybersecurity firm Proofpoint reports that "phishing is the initial point of compromise in most significant [healthcare] security incidents, according to a recent report from

---

*Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), https://www.idtheftcenter.org/surveys-studys.

[11] Identity Theft Resource Center, *2017 Annual Data Breach Year-End Review*, https://www.idtheftcenter.org/2017-data-breaches/.

[12] Identity Theft Resource Center, *2018 End -of-Year Data Breach Report*, https://www.idtheftcenter.org/2018-data-breaches/.

[13] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for- victims/.

[14] *Id.*

[15] *2019 HIMSS Cybersecurity Survey*, https://www.himss.org/2019-himsscybersecurity-survey.

the Healthcare Information and Management Systems Society (HIMSS). And yet, 18% of healthcare organizations fail to conduct phishing tests, a finding HIMSS describes as "incredible."[16]

54.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precaution for protection."[17]

55.     The threat continues. In August 2022, the Consumer Finance Protection Bureau (CFPB) published a circular on data security. The CFPB noted that "[w]idespread data breaches and cyberattacks have resulted in significant harms to consumers, including monetary loss, identity theft, significant time and money spent dealing with the impacts of the breach, and other forms of financial distress," and the circular concluded that the provision of insufficient security for consumers' data can violate the prohibition on "unfair acts or practices" in the Consumer Finance Protection Act (CFPA).[18]

56.     Charged with handling sensitive Private Information, including healthcare information, Defendant knew, or should have known, the importance of safeguarding its patients' Private Information that was entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on its patients after a breach. WIRX failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

57.     With respect to training, Defendant specifically failed to:

- Implement a variety of anti-ransomware training tools, in combination, such as computer-based training, classroom training, monthly newsletters, posters, login alerts, email alerts, and team-based discussions;

---

[16] Aaron Jensen, *Healthcare Phishing Statistics: 2019 HIMSS Survey Results*, PROOFPOINT (Mar. 27, 2019), https://www.proofpoint.com/us/security-awareness/post/healthcare-phishingstatistics-2019-himss-survey-results.

[17] *See How to Protect Your Networks from RANSOMWARE*, FBI (2016) https ://www. fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

[18] CONSUMER FIN. PROT. BUREAU, *Consumer Financial Protection Circular 2022-04: Insufficient data protection or security for sensitive consumer information* (Aug. 11, 2022), https://files.consumerfinance.gov/f/documents/cfpb_2022-04_circular_2022-08.pdf.

- Perform regular training at defined intervals such as bi-annual training and/or monthly security updates; and

- Craft and tailor different approaches to different employees based on their base knowledge about technology and cybersecurity.

58.    The Private Information was also maintained on WIRX's computer network environment in a condition vulnerable to cyberattacks, such as through the infiltration of Defendant's systems and computer network environment. The mechanism of the cyberattack and the potential for improper disclosure of Plaintiff and Class Members' Private Information was a known risk to WIRX. Thus, it was on notice that failing to take reasonable steps necessary to secure the Private Information from those risks left the sensitive and confidential data, including PHI, in a vulnerable position.

**B.    The Monetary Value of Privacy Protections and Private Information**

59.    The fact that Plaintiff and Class Members' Private Information was stolen means that Class Members' information is likely for sale by cybercriminals and will be misused in additional instances in the future.

60.    At all relevant times, Defendant was well aware that the Private Information it collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for nefarious purposes.

61.    Private Information is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[19]  Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and PHI on multiple underground Internet websites, commonly referred to as the dark web.

62.    At an FTC public workshop in 2001, then Commissioner Orson Swindle

---

[19] Federal Trade Commission, *Warning Signs of Identity Theft* (Sept. 2018), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft .

described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[20]

63.    Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 Billion per year online advertising industry in the United States.[21]

64.    The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[22]

65.    Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information.[23]  The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their Private Information. This business has created a new market for the sale

---

[20] *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[21] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703 5290 [hereinafter *Web's New Hot Commodity*].

[22] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

23 *Web's Hot New Commodity*, *supra* note 17.

and purchase of this valuable data.

66.    Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[24]

67.    The value of Plaintiff and Class Members' Private Information on the black market is substantial. Sensitive health information can sell for as much as $363.[25] This information is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

68.    Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[26]

69.    The ramifications of WIRX's failure to keep its patients' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to twelve months or even longer.

---

24 *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].

25 Center for Internet Security, *Data Breaches: In the Healthcare Sector*, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/.

26 Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KAISER (Feb. 7, 2014) https://khn.org/news/rise-of-indentity-theft/.

70.    Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened.[27] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[28]

71.    Breaches are particularly serious in healthcare industries. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[29] Indeed, when compromised, healthcare related data is among the most private and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[30] Almost 50% of the surveyed victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Seventy-four percent said that the effort to resolve the crime and restore their identity was significant or very significant. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[31]

72.    At all relevant times, Defendant was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for

---

[27] *See Medical ID Theft Checklist*, IDENTITYFORCE, https://www.identityforce.com/blog/medical-id-theft-checklist-2.

[28] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches*, EXPERIAN, (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

[29] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report*, (2019) https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

[30] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for- victims/.

[31] *Id.*

wrongful purposes by third parties, such as in furtherance of identity theft and fraud. Defendant should have particularly been aware of these risks, given the significant number of data breaches affecting the healthcare industry.

73.    Had Defendant remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendant would have prevented the attack into its computer network and, ultimately, the theft of its patients' Private Information.

74.    The compromised Private Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about an individual that can be logically associated with other information can be chained together, increasing its utility to criminals. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[32] For example, different PII and/or PHI elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[33] Based upon information and belief, the unauthorized parties utilized the Private Information they obtained through the Data Breach to obtain additional information from Plaintiff and Class Members that was misused.

75.    In addition, as technology advances, computer programs may scan the Internet with wider scopes to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

76.    Plaintiff and Class Members now face an impending, substantial risk of identity

---

[32] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, FED. TRADE COMM'N 35-38 (Dec. 2010), https://www.ftc.gov/reports/preliminary-ftc-staff-report-protecting-consumer-privacy-era-rapid-change-proposed-framework.

[33] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

theft and medical insurance fraud.

77.    In short, the Private Information exposed is of great value to hackers and cybercriminals and the data compromised in the Data Breach can be used in furtherance of various unlawful acts, including opening new credit and financial accounts in users' names.

**C.    WIRX's Conduct Violated HIPPA**

78.    HIPAA requires covered entities like WIRX to protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.[34]

79.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information like the data Defendant left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

80.    The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[35]

81.    Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations. WIRX's security failures include, but are not limited to, the following:

- Failing to ensure the confidentiality and integrity of electronic protected health information that Defendant creates, receives, maintains, and transmits in violation of 45 C.F.R. §164.306(a)(1);

---

[34] *What is Considered Protected Health Information Under HIPAA?*, HIPPA JOURNAL, https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/.

[35] *Breach Notification Rule*, U.S. DEP'T HEALTH & HUMAN SERVS., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html.

- Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

- Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

- Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

- Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

- Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

- Failing to ensure compliance with HIPAA security standard rules by its workforce in violation of 45 C.F.R. §164.306(a)(94);

- Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*;

- Failing to effectively train all members of its workforce (including agents and independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

- Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

**D.    WIRX Failed to Comply with FTC Guidelines**

82.    WIRX was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

83.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[36]

84.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[37] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

85.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[38]

86.    The FTC has brought enforcement actions against businesses for failing to

---

[36] *Start With Security: A Guide for Business*, Fed. Trade. Comm'n (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf [hereinafter *Start with Security*].

[37] *Protecting Personal Information: A Guide for Business*, Fed. Trade. Comm'n (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf- 0136_proteting-personal-information.pdf.

[38] *Start with Security*, *supra* note 32.

adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

87.    WIRX was at all times fully aware of its obligation to protect the Private Information of its patients. WIRX was also aware of the significant repercussions that would result from its failure to do so.

88.    As evidenced by Defendant's failure to comply with its legal obligations established by the FTC Act, Defendant failed to properly safeguard Class Members' Private Information, allowing hackers to access the sensitive data.

**E.    WIRX Failed to Comply with Healthcare Industry Standards**

89.    HHS's Office for Civil Rights has stated:

> While all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations, as they store large quantities of highly Private and valuable data.[39]

90.    HHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience that require a relatively small financial investment, yet can have a major impact on an organization's cybersecurity posture, including: (a) ensuring the proper encryption of Private Information; (b) educating and training healthcare employees on how to protect Private Information; and (c) correcting the configuration of software and network devices.

91.    Private cybersecurity firms have also identified the healthcare sector as being particularly vulnerable to cyberattacks, both because of the value of the Private Information that

---

[39] *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA JOURNAL (Nov. 1, 2018), https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/.

it maintains and because as an industry, it has been slow to adapt and respond to cybersecurity threats.[40] They too have promulgated similar best practices for bolstering cybersecurity and protecting against the unauthorized disclosure of Private Information.

92.     Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, WIRX chose to ignore them. These best practices were known, or should have been known to WIRX, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of Private Information.

**F.      Damages to Plaintiff and the Class**

93.     Plaintiff and the Class have been damaged by the compromise of their Private Information in the Data Breach.

94.     The ramifications of WIRX's failure to keep its patients' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to the victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[41]

95.     In addition to its obligations under state and federal laws and regulations, Defendant owed a common law duty to Plaintiff and Class Members to protect their Private Information, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting the sensitive data in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

96.     Defendant further owed and breached its duty to Plaintiff and Class Members to implement processes and specifications that would detect a breach of its security systems in a timely manner and to timely act upon warnings and alerts, including those generated by its own security systems.

---

[40] *See, e.g.*, *10 Best Practices For Healthcare Security*, INFOSEC, https://resources.infosecinstitute.com/topics/healthcare-information-security/#gref.

[41] *2014 LexisNexis True Cost of Fraud Study*, LEXISNEXIS (Aug. 2014), https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

97.    As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise commit the identity theft and misuse of Plaintiff and Class Members' Private Information as detailed above, and Plaintiff and Members of the Class are at a heightened and increased substantial risk of suffering identity theft and fraud.

98.    The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

99.    Some of the injuries and risks associated with the loss of Private Information have already manifested themselves in Plaintiff and other Class Members' lives.

100.    Plaintiff and the Class face a substantial risk of suffering out-of-pocket fraud losses such as fraudulent charges on online accounts, credit card fraud, applications for benefits made fraudulently in their names, loans opened in their names, medical services billed in their names, government benefits fraudulently drawn in their name, and identity theft. Many Class Members may already be victims of identity theft and fraud without realizing it.

101.    Plaintiff and Class Members have, may have, and/or will have incurred out-of-pocket costs for protective measures, such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

102.    Plaintiff and Class Members would have insisted upon another pharmacy had they known that Defendant failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Private Information from criminal theft and misuse.

103.    Plaintiff and the Class will continue to spend significant amounts of time monitoring their financial and medical accounts for misuse.

104.    Identity thieves can use the victim's Private Information to commit any number of

21

frauds, such as obtaining a job, procuring housing, or even giving false information to police during arrest. In the healthcare industry, Private Information can be used to submit false insurance claims. As a result, Plaintiff and Class Members now face a real and continuing immediate risk of identity theft and other problems associated with the disclosure of their Social Security numbers and will need to monitor their credit for an indefinite duration. For Plaintiff and Class Members, this risk creates unending feelings of fear and annoyance. Private information is especially valuable to identity thieves. Defendant knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

105.    As a result of the Data Breach, Plaintiff and Class Members' Private Information has diminished in value.

106.    The Private Information belonging to Plaintiff and Class Members is confidential and was left inadequately protected by Defendant who did not obtain Plaintiff or Class Members' consent to disclose such Private Information to any other person, as required by applicable law and industry standards. Defendant disclosed Plaintiff and Class Members' Private Information as a direct result of its inadequate security measures.

107.    The Data Breach was a direct and proximate result of Defendant's failure to: (a) properly safeguard and protect Plaintiff and Class Members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff and Class Members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

108.    Defendant had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite its obligation to protect customer data.

109.    Defendant did not properly train its employees, particularly its information technology department, to timely identify and/or avoid cyberattacks attacks.

110.    Had Defendant remedied the deficiencies in its data security systems and adopted

22

security measures recommended by experts in the field, it would have prevented the intrusions into computer network and, ultimately, the theft of Plaintiff and Class Members' Private Information.

111.    As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family, in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

112.    The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[42]

113.    Further, Defendant's attempt to burden Plaintiffs and Class Members with the responsibility to rectify the consequences of the Data Breach it allowed, constitutes no assistance at all.

114.    Defendant's failure to adequately protect Plaintiff and Class Members' Private Information has resulted in Plaintiff and Class Members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money–while Defendant sits by and does nothing to assist those affected by the incident. Instead, the burden is on Plaintiff and Class Members to discover possible fraudulent activity and identity theft and mitigate the negative impacts arising from such fraudulent activity on their own.

115.    Thus, to mitigate harm, Plaintiff and Class Members are burdened with indefinite monitoring and vigilance of their accounts.

116.    Worse still, the limited offer of credit monitoring is woefully inadequate. While

---

[42] *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].

some harm has already taken place, the worst is yet to come. There may be a time lag between when harm occurs versus when it is discovered, and between when Private Information is acquired and when it is used. Furthermore, identity theft monitoring only alerts someone to the fact that they have already been the victim of identity theft (i.e., fraudulent acquisition and use of another person's Private Information) – it does not prevent identity theft.[43] This is especially true for many kinds of medical identity theft, for which most credit monitoring plans provide little or no monitoring or protection.

117.    Plaintiff and Class Members have been damaged in several other ways as well. Plaintiff and Class Members have been exposed to an impending, imminent, and ongoing increased risk of fraud, identity theft, and other misuse of their Private Information. Plaintiff and Class Members must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming task. Class Members have also been forced to purchase adequate credit reports, credit monitoring and other identity protection services, and have placed credit freezes and fraud alerts on their credit reports, while also spending significant time investigating and disputing fraudulent or suspicious activity on their accounts. As a result of the Data Breach, Plaintiff and Class Members have also suffered a loss of the inherent value of their Private Information.

118.    The Private Information stolen in the Data Breach can be misused on its own or can be combined with personal information from other sources (such as publicly available information, social media, etc.) to create a package of information capable of being used to commit further identity theft. Thieves can also use the stolen Private Information to send spear-phishing emails to Class Members to trick them into revealing sensitive information. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the Class Member agrees to provide the confidential data requested in the email, such as login credentials, account numbers, and the like.

---

[43] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, CNBC (Nov. 30, 2017), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-beworth-the-cost.html.

119.    As a result of Defendant's failures to prevent the Data Breach, Plaintiff and Class

Members have suffered, will suffer, and are at increased risk of suffering:

- The compromise, publication, theft and/or unauthorized use of their Private Information;

- Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

- Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

- The continued risk to their Private Information, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the Private Information in its possession;

- Current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and

- Anxiety and distress resulting from fear of misuse of their Private Information.

120.    In addition to a remedy for economic harm, Plaintiff and Class Members maintain

an undeniable interest in ensuring that their Private Information remains secure and is not subject

to further misappropriation and theft.

## CLASS ACTION ALLEGATIONS

121.    Plaintiff brings all counts, as set forth below, individually and as a class action,

pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, on behalf of a

"Nationwide Class" (the "Class") defined as:

### Nationwide Class

All persons residing in the United States whose Private Information was submitted to Defendant and whose Private Information was compromised as a result of the Data Breach discovered    in    or    about    December    2025.

122.    Excluded from the Class are Defendant and Defendant's affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

123.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

124.    **Numerosity**—Federal Rule of Civil Procedure 23(a)(1). The Members of the Class are so numerous that joinder of all Class Members would be impracticable. On information and belief, the Class has thousands of Members.

125.    **Commonality and Predominance**—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3). Common questions of law and fact exist as to all Members of the Class and predominate over questions affecting only individual Members of the Class.  Such common questions of law or fact include, inter alia:

a.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, e.g., FTCA, HIPAA and the CMIA (as discussed below);

b.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

c.    Whether Defendant properly implemented its purported security measures to protect Plaintiff's and the Class' Private Information from unauthorized capture, dissemination, and misuse;

d.    Whether Defendant took reasonable measures to determine the extent of the Data Breach after it first learned of same;

e.    Whether Defendant disclosed Plaintiff's and the Class' Private

Information in violation of the understanding that the Private Information was disclosed in confidence and should be maintained as such;

 f. Whether Defendant's conduct constitutes breach of an implied contract;

 g. Whether Defendant willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiff's and the Class' Private Information;

 h. Whether Defendant was negligent in failing to properly secure and protect Plaintiff's and the Class' Private Information;

 i. Whether Defendant was unjustly enriched by its actions; and

 j. Whether Plaintiff and the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

126. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and other Members of the Class. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

127. **Typicality**—Federal Rule of Civil Procedure 23(a)(3). Plaintiff's claims are typical of the claims of the other Members of the Class because, among other things, all Class Members were similarly injured through Defendant's uniform misconduct described above and were thus all subject to the Data Breach alleged herein.  Further, there are no defenses available to Defendant that are unique to Plaintiff.

128. **Adequacy of Representation**—Federal Rule of Civil Procedure 23(a)(4). Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class she seeks to represent, she has retained counsel competent and experienced

in complex class action litigation, and Plaintiff will prosecute this action vigorously. The Class' interests will be fairly and adequately protected by Plaintiff and her counsel.

129.    **Injunctive Relief**—Federal Rule of Civil Procedure 23(b)(2). Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

130.    **Superiority**—Federal Rule of Civil Procedure 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Members of the Class to individually seek redress for Defendant's wrongful conduct. Even if Members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action mechanism presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and the Class)**

131.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

132.    Upon Defendant's accepting and storing the Private Information of Plaintiff and the Class in its computer network, Defendant undertook and owed a duty to Plaintiff and the Class to exercise reasonable care to secure and safeguard that information and to use

commercially reasonable methods to do so. Defendant knew that the Private Information was private and confidential and should be protected as such.

133.    Defendant owed a duty of care not to subject Plaintiff's and Class Members' Private Information to an unreasonable risk of exposure and theft because Plaintiff and Class Members were foreseeable and probable victims of any inadequate data security practices.

134.    Defendant owed numerous duties to Plaintiff and the Class, including the following:

     a.    to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in its possession;

     b.    to protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

     c.    to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

135.    Defendant also breached its duty to Plaintiff and Class Members to adequately protect and safeguard Private Information by disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Private Information. Furthering its dilatory practices, Defendant failed to provide adequate supervision and oversight of the Private Information with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted a malicious third party to gather Plaintiff's and Class Members' Private Information and potentially misuse it, and intentionally disclose it to others without consent.

136.    Defendant knew, or should have known, of the risks inherent in collecting and storing Private Information and the importance of adequate security. Defendant knew or should have known about numerous well-publicized data breaches within the healthcare industry.

137.    Defendant knew, or should have known, that its data networks did not adequately safeguard Plaintiff's and Class Members' Private Information.

138.    Defendant breached its duties to Plaintiff and Class Members by failing to provide

a fair, reasonable, or adequate computer network and data security practices to safeguard Plaintiff's and Class Members' Private Information.

139.    Because Defendant knew that a breach of its network would damage thousands of its patients, including Plaintiff and Class Members, Defendant had a duty to adequately protect its data network and the Private Information contained therein.

140.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its computer systems and networks were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

141.    Defendant's duty to use reasonable security measures under HIPAA required it to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitute "protected health information" within the meaning of HIPAA.

142.    In addition, WIRX had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

143.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

144.    WIRX's own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendant's misconduct included failing to: (1) secure Plaintiff's and Class Members' Private Information; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

145.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information, and by failing to provide timely notice of the Data Breach. The specific negligent acts and omissions committed by WIRX include, but are not limited to, the following:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

    b.    Failing to adequately monitor the security of Defendant's networks and systems;

    c.    Allowing unauthorized access to Class Members' Private Information;

    d.    Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

    e.    Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

146.    Through Defendant's acts and omissions described in this Complaint, including its failure to provide adequate security and its failure to protect Plaintiff's and Class Members' Private Information from being foreseeably captured, accessed, disseminated, stolen and misused, WIRX unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiff's and Class Members' Private Information during the time it was within its possession or control.

147.    Defendant's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to failing to adequately protect the Private Information and failing to provide Plaintiff and Class Members with timely notice that their sensitive Private Information had been compromised.

148.    Neither Plaintiff nor the other Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

149.    As a direct and proximate cause of Defendant's conduct, Plaintiff and Class Members suffered damages as alleged above.

31

150.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide lifetime free credit monitoring to all Class Members.

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

151.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

152.    Defendant solicited Plaintiff's and Class Members' Private Information as part of its regular business practices. Plaintiff's and Class Members' Private Information was provided to WIRX[44].

153.    Plaintiff and Class Members entered into implied contracts with WIRX when their Private Information was provided to Defendant, pursuant to which WIRX agreed to safeguard and protect such information and to timely detect any breaches of Plaintiff's and Class Members' Private Information. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA and the CMIA, and were consistent with industry standards.

154.    Plaintiff and Class Members would not have allowed their Private information to be entrusted with WIRX in the absence of the aforesaid implied contracts.

155.    Plaintiff and Class Members fully performed their obligations under the implied contracts with WIRX.

156.    Defendant breached the implied contracts it made with Plaintiff and Class Members by failing to safeguard and protect their Private Information and by failing to timely

---

[44] Upon information and belief, Class Members either provided WIRX with their information, or their employers' insurance companies did regarding their workers' compensation claims.

detect the Data Breach within a reasonable time.

157.    As a direct and proximate result of Defendant's breaches of the implied contracts between itself, Plaintiff, and Class Members, Plaintiff and Class Members sustained actual losses and damages as described in detail above.

158.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide free credit monitoring to all Class Members.

<u>**COUNT III**</u>
**UNJUST ENRICHMENT/QUASI-CONTRACT**
**(On Behalf of Plaintiff and the Class)**

159.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

160.    Plaintiff and Class Members conferred a benefit upon WIRX when their Private Information was shared with Defendant. In exchange, Plaintiff and Class Members should have received from Defendant the services that were the subject of the transaction and should have been entitled to have Defendant protect their Private Information with adequate data security.

161.    Defendant knew that Plaintiff and Class Members conferred a benefit on it and accepted and has retained that benefit. Defendant has used Plaintiff's and Class Members' Private Information for business purposes.

162.    Defendant failed to secure Plaintiff's and Class Members' Private Information and therefore, did not provide full compensation for the benefit Plaintiff's and Class Members' Private Information provided.

163.    Defendant acquired the Private Information through inequitable means as it failed to disclose the inadequate security practices previously alleged.

164.    If Plaintiff and Class Members knew that WIRX would not secure their Private Information using adequate security, they would not have entrusted Defendant with their Private Information.

165.    Plaintiff and Class Members have no adequate remedy at law.

166.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred onto it.

167.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them.

**COUNT IV**
**BREACH OF CONFIDENCE**
**(On Behalf of Plaintiff and the Class)**

168.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

169.    Plaintiff and Class Members have an interest, both equitable and legal, in the Private Information that was conveyed to and collected, stored, and maintained by Defendant and which was ultimately compromised by unauthorized cybercriminals as a result of the Data Breach.

170.    Defendant, in taking possession of this highly sensitive information, has a special relationship with its patients, including Plaintiff and the Class. As a result of that special relationship, Defendant was provided with and stored private and valuable information belonging to Plaintiff and the Class, which Defendant was required by law and industry standards to maintain in confidence.

171.    Plaintiff's and the Class' Private Information was provided to Defendant under, at minimum, an implied agreement that WIRX would limit and/or restrict completely the use and disclosure of such sensitive data without Plaintiff's and Class Members' consent.

172.    Defendant had a common law duty to maintain the confidentiality of Plaintiff's and Class Members' Private Information.

173.    Defendant owed a duty to Plaintiff and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed by, misused by, or disclosed to

unauthorized persons.

174.    As a result of the parties' relationship of trust, Defendant had possession and knowledge of the confidential Private Information of Plaintiff and Class Members.

175.    Plaintiff's and Class Members' Private Information is not generally known to the public and is confidential by nature. Moreover, Plaintiff and Class Members did not consent to nor authorize Defendant to release or disclose their Private Information to unknown criminal actors.

176.    Defendant breached the duty of confidence it owed to Plaintiff and Class Members when Plaintiff's and Class Members' Private Information was disclosed to unknown criminal hackers by way of Defendant's own acts and omissions, as alleged herein.

177.    Defendant knowingly breached its duties of confidence by failing to safeguard Plaintiff's and Class Members' Private Information, including by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information that resulted in the unauthorized access and compromise of the Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the Data Breach at the time it began or within a reasonable time thereafter and give adequate notice to Plaintiff and Class Members thereof; (g) storing Private Information in an unencrypted and vulnerable manner, allowing its disclosure to hackers; and (h) making an unauthorized and unjustified disclosure and release of Plaintiff's and Class Members' Private Information to a criminal third party.

178.    But for Defendant's wrongful breach of confidence owed to Plaintiff and Class Members, their privacy would not have been compromised and their Private Information would not have been accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by and/or viewed by unauthorized third parties.

179.    As a direct and proximate result of Defendant's breach of confidence, Plaintiff and Class Members have suffered or will suffer injuries, including but not limited to: (i) loss of their privacy and confidentiality in their Private Information; (ii) theft of their Private Information; (iii) costs associated with the detection and prevention of fraud and unauthorized use of their Private Information; (iv) costs associated with purchasing credit monitoring and identity theft protection services; (v) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Defendant's Data Breach – including finding fraudulent charges, enrolling in credit monitoring and identity theft protection services, and filing reports with the police and FBI; (vi) the imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals; (vii) damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; (viii) continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and/or (ix) mental anguish accompanying the loss of confidence and disclosure of their confidential Private Information.

180.    Defendant breached the confidence of Plaintiff and Class Members when it made an unauthorized release and disclosure of their confidential Private Information and, accordingly, it would be inequitable for Defendant to retain the benefits it has received at Plaintiff's and Class Members' expense.

181.    As a direct and proximate result of Defendant's breach of confidence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## COUNT V
## BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and the Class)

182.    Plaintiff fully incorporates all of the above Paragraphs as though fully set forth herein.

183.    In light of the special relationship between WIRX, Plaintiff, and Class Members, whereby Defendant became a guardian of their Private Information, Defendant became a fiduciary by its undertaking and guardianship of Plaintiff's and Class Members' Private Information and therefore, was required to act primarily for the benefit of its patients, including Plaintiff and Class Members, for (among other things): the safeguarding of their Private Information, and to timely notify Plaintiff and the Class Members of the Data Breach,

184.    WIRX breached its fiduciary duties to Plaintiff and Class Members by failing to protect the integrity of the computer network containing Plaintiff and Class Member's Private Information.

185.    WIRX also breached its fiduciary duties to Plaintiff and Class Members by failing to timely notify them of the Data Breach.

186.    Defendant breached its fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff and Class Members' Private Information.

187.    As a direct and proximate result of WIRX's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in WIRX's possession and is subject to further unauthorized disclosures so long as WIRX fails to undertake appropriate and

adequate measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of WRX's services they received.

188.    As a direct and proximate result of WIRX's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT VI**
**INJUNCTIVE / DECLARATORY RELIEF**
**(On Behalf of Plaintiff and the Class)**

189.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

190.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. The Court also has broad authority to restrain acts, such as here, that are tortious and violate the terms of the regulations described in this Complaint.

191.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective duties to reasonably safeguard patients' Private Information and whether WIRX is maintaining data security measures adequate to protect Class Members, including Plaintiff, from further data breaches that compromise their Private Information.

192.    Plaintiff alleges that Defendant's data security measures remain inadequate. In addition, Plaintiff and the Class continue to suffer injury as a result of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information and fraudulent activity against them will occur in the future.

193.    Pursuant to its authority under the Declaratory Judgment Act, Plaintiff asks the Court to enter a judgment declaring, among other things, the following: (i) WIRX owes a duty to secure patients' Private Information and to timely notify them of a data breach under the common law and various federal and state statutes; and (ii) WIRX is in breach of these legal

duties by failing to employ reasonable measures to secure patients' Private Information in its possession and control.

194. Plaintiff further asks the Court to issue corresponding prospective injunctive relief requiring WIRX to employ adequate security protocols consistent with law and industry standards to protect patients' Private Information from future data breaches.

195. If an injunction is not issued, Class Members will suffer irreparable injury and lack an adequate legal remedy, in the event of another data breach at WIRX. The risk of another such breach is real, immediate, and substantial. If another cyberattack at WIRX occurs, the Class Members will not have an adequate remedy at law because many of the resulting injuries would not be readily quantifiable and Class Members will be forced to bring multiple lawsuits to rectify the same misconduct.

196. The hardship to the Class Members if an injunction does not issue exceeds the hardship to WIRX if an injunction is issued. Among other things, if a similar data breach occurs due to the repeated misconduct of WIRX, Class Members will likely be subjected to substantial hacking and phishing attempts, fraud, and other instances of the misuse of their Private Information, in addition to the damages already suffered. On the other hand, the cost to WIRX of complying with an injunction by employing better and more reasonable prospective data security measures is relatively minimal, and WIRX has pre-existing legal obligations to employ such measures.

197. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing additional data breaches at WIRX, thus eliminating the additional injuries that would result to the Class Members whose personal and confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

    a. For an order certifying the proposed Class and appointing Plaintiff and her counsel to represent the Class;

b.  For an order awarding Plaintiff and Class Members actual, statutory, punitive, and/or any other form of damages provided by and pursuant to the statutes cited above;

c.  For an order awarding Plaintiff and Class Members restitution, disgorgement and/or other equitable relief provided by and pursuant to the statutes cited above or as the Court deems proper;

d.  For an order or orders requiring Defendant to adequately remediate the Data Breach and its effects.

e.  For an order awarding Plaintiff and Class Members pre-judgment and post-judgment interest;

f.  For an order awarding Plaintiff and the Class Members reasonable attorneys' fees and costs of suit, including expert witness fees;

g.  For an order awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: March 5, 2026                    By:    */s/ Kevin Abramowicz*

Kevin Abramowicz
EAST END TRIAL GROUP LLC
6901 Lynn Way, Suite 503
Pittsburgh, PA 15208
Office: (412) 223-5740
kabramowicz@eastendtrialgroup.com

Nicholas A. Migliaccio*
Jason S. Rathod*
Saran Q. Edwards*
**MIGLIACCIO & RATHOD LLP**
412 H Street NE Ste 302
Washington, DC 20002
Office: (202) 470-3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com
sedwards@classlawdc.com

* *pro hac vice* forthcoming

*Attorneys for Plaintiff and the Proposed Class*